IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | No. 4:21-CR-00365-RLW |
| ) | |
| WAYNE LOZIER, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**SENTENCING MEMORANDUM**

**Introduction**

On March 1, 1932, Charles Lindbergh, Jr.—the son of famed American aviator Charles Lindbergh—was abducted from his crib in the Lindbergh home in East Amwell, New Jersey. The investigation in the aftermath of the abduction was extensive, involving the local police, New Jersey State Police, and the Federal Bureau of Investigation. Over approximately two months, a search of the home and surrounding area was conducted, and several investigative methods were used to find Charles, Jr., alive and safe. Unfortunately, however, Charles, Jr., was found on May 12, 1932, having died of head trauma. The nature of the crime along with the celebrity status and influence of Charles, Sr., led to swift action by the federal government. Forty-one days later, President Herbert Hoover signed the Federal Kidnapping Act—commonly known as the "Lindbergh Law"—into law on June 22, 1932.

The purpose of the Federal Kidnapping Act was to let federal authorities step in and pursue kidnappers once they had crossed state lines with their victim. The theory behind the Lindbergh Law was that federal law enforcement intervention was necessary because state and local law enforcement officers could not effectively pursue kidnappers across state lines. Since federal law enforcement has national law enforcement authority, Congress believed they could do a much more effective job of dealing with kidnappings than could state authorities.

From its passage into law, the Federal Kidnapping Act was used to prosecute individuals and groups of people for serious kidnapping offenses. In what was the first prosecution under the Lindbergh Law, notorious Prohibition Era gangster George "Machine Gun Kelly" Barnes and his co-conspirators (including his wife) were sentenced to life in prison for kidnapping wealthy oil tycoon Charles Urschel for ransom in July 1933. Almost uninterrupted over the next ninety years were several prosecutions under the Act for kidnappings that occurred during the course of robberies, for the purpose of gaining ransom, and for the purpose of raping and/or murdering the victim. What is unprecedented, however, is that in the long history of the Act being used to prosecute gangsters, members of organized crime, and other violent individuals, it appears that the first time the Act has been used to prosecute a licensed bounty hunter for apprehending a fugitive with a valid arrest warrant

2

occurred in 2021 with the arrest of Mr. Wayne Lozier, conduct that is completely different from what Congress contemplated in 1932.

The facts of this case are virtually undisputed. Mrs. Rebecca Carman was arrested for a misdemeanor offense in Louisiana. She missed a court appearance, and a warrant was issued in her Louisiana court case. To avoid owing the surety to the court, the individual who posted Mrs. Carman's bail—Robb Farmer, owner of A-Affordable Bail Bonds—hired Mr. Lozier, a Louisiana-licensed bounty hunter, to apprehend Mrs. Carman and bring her back to Louisiana. While Mr. Lozier did not conduct adequate research into Missouri bail laws, the evidence shows that he did conduct some limited research before conducting the apprehension. Mr. Lozier and his codefendant Jody Sullivan drove to Louisiana to apprehend Mrs. Carman, and they took her into their custody. After being told by one police officer that he had the authority to continue and another officer that what he was doing was wrong, Mr. Lozier and Ms. Sullivan—who were still operating under the belief that they were doing their job and at the instruction of Mr. Farmer—continued to drive back home. Eventually, Mr. Lozier and Ms. Sullivan dropped Mrs. Carman off at a jail in Mississippi.

What is also undisputed is that the difference between a lawful apprehension and federal kidnapping is, according to Kevin Davidson of the Missouri Department of Commerce and Insurance, $150 and a phone call. Specifically, had Mr. Lozier

taken the additional steps of verifying his significant hours of training and experience, paying the $150 Missouri licensing fee, and called the St. Peters Police Department before apprehending Mrs. Carman, no amount of kicking and screaming on Mrs. Carman's part would have made a difference.  The apprehension would have been lawful.  The government conceded in its closing arguments to the jury that the crux of this case are state licensing and notification issues.  Had Mr. Lozier not taken a shortcut, paid $150, and made a phone call to local law enforcement, maybe we wouldn't be here.  Additionally, had he been charged in state court with violating the Missouri licensing requirement, he would be subject to a statutory maximum penalty of four years imprisonment.  Incredibly, however, because he was charged with and convicted of federal kidnapping, he is now subject to a maximum penalty of life imprisonment and a guidelines range of 151 to 188 months (approximately 12 1/2 to 15 1/2 years) imprisonment.

      The advisory sentencing guidelines range does not account for the nature of the kidnapping and other factors.  Instead, U.S.S.G. § 2A4.1 lumps every variant of a kidnapping into the same Base Offense Level 32, which yields the resulting advisory guidelines range.  As made clear by the evidence in this case, Mr. Lozier is not the archetypal defendant that Congress contemplated when enacting the Federal Kidnapping Act.  Because of this, Mr. Lozier believes that his incredibly unique status warrants an incredibly unique sentence.  It is for this reason that Mr. Lozier is

4

requesting that this Court sentence him to a term of **twenty-four (24) months** imprisonment, as the requested sentence would be sufficient, but not greater than necessary to comply with the sentencing factors enumerated in 18 U.S.C. § 3553(a).

**Mr. Lozier's History and Characteristics**

Mr. Lozier was born into chaos. His father, an abusive alcoholic, routinely beat Mr. Lozier's mother for the most mundane of reasons. It reached a point that Mr. Lozier's mother left the household with her young children, and from ages six to twelve Mr. Lozier spent most of his time with his mother living in various domestic violence shelters to avoid his father's drunken rages. Life did not improve by much, however. At age twelve, Mr. Lozier reported being abused along with his younger brother by a family friend at church. This led to an onset of behavioral issues that led to Mr. Lozier being placed in foster care in Louisiana until he was eighteen. The Louisiana Foster Care System is far from perfect; even today, foster children greatly outnumber certified foster parents there.[1]

Despite his uninterrupted struggles as a minor, Mr. Lozier persevered. While he withdrew from high school, he eventually obtained his GED. He then entered the United States Army, ultimately receiving an honorable discharge. After moving

---

[1] Brittany Breeding, *Children in foster care in Louisiana greatly outnumber certified Foster Parents*, located at: https://www.ktbs.com/news/arklatex-indepth/children-in-foster-care-in-louisiana-greatly-outnumber-certified-foster-parents/article_2b94e93e-63b5-11ee-91eb-ef99fec9b520.html (Accessed January 19, 2024).

5

around the South and working different jobs to support himself and his family, he ultimately became a licensed bail bondsman through the Louisiana Department of Insurance, and he opened his own bail bonds and fugitive recovery businesses.  While the instant offense stems from his status as a fugitive recovery agent, Mr. Lozier ran a largely successful business both before and after this incident occurred.

Mr. Lozier has been married once before.  While the marriage dissolved, it yielded his first child, Alysa.  Mr. Lozier and Alysa had a strained relationship due to issues between Mr. Lozier and Alysa's mother; however, they reconnected in 2018, and Mr. Lozier has done everything he can since then to make up for the time that he lost with Alysa.  Mr. Lozier was also in a significant relationship with his codefendant, Jody Sullivan.  The significance of their relationship was outlined in Ms. Sullivan's sentencing memorandum (Dkt. # 213-1).  When Ms. Sullivan dealt with a significant health issue, Mr. Lozier was there every step of the way, assisting Ms. Sullivan financially, attending medical appointments with her, etc.  Even after the relationship ended, Mr. Lozier continued to assist Ms. Sullivan.  Most recently, Mr. Lozier has been in a relationship with Sarah Chiasson, who gave birth to his son, Wayne, Jr., in 2022.  Mr. Lozier looks forward to the chance to hold Wayne, Jr., for the first time and to be a better father than he had.  Not being able to be there for Sarah and Wayne, Jr.—who has also dealt with medical issues—due to his incarceration has had a devastating effect on Mr. Lozier.

Prior to this case, Mr. Lozier had never been incarcerated. His history makes that clear; this conviction represents the first and only felony conviction that Mr. Lozier has ever received. His only other brush with the law that resulted in a conviction is a misdemeanor harassing communications conviction from 2012. Mr. Lozier went 45 years of his life without a felony conviction; it seems likely that Mr. Lozier is unlikely to receive another felony conviction based on future conduct.

**The Need to Avoid Unwarranted Sentencing Disparities Between Similarly Situated Defendants**

Mr. Lozier concedes that he is more culpable than Ms. Sullivan in that he was tasked with the job of apprehending Mrs. Carman and that he controlled their movements throughout the journey. He also recognizes that Ms. Sullivan pleaded guilty while he elected to proceed to trial. However, it is important to note that Ms. Sullivan was more than a mere passenger whose only role (as a woman) was to ensure that nothing inappropriate occurred between Mr. Lozier and Ms. Carman. As the video footage makes clear, Ms. Sullivan was an active participant in the apprehension. Despite having the initial desire to exercise her right to a jury trial along with Mr. Lozier, Ms. Sullivan ultimately accepted the government's offer to plead guilty, and she received probation—or zero months of incarceration. The ultimate questions that must be answered is how much *more* culpable Mr. Lozier was, and what sentence is Mr. Lozier's heightened culpability worth? It is Mr. Lozier's belief that the penalty for his role in the offense and his desire to go to trial

is not ten times (or greater) than that of Ms. Sullivan's role and her decision to plead guilty. Sentencing Mr. Lozier within the advisory guidelines range, or anywhere in the neighborhood, would create a significant sentencing disparity between two similarly situated individuals who engaged in the same conduct, particularly when—as mentioned *supra*—this is not the type of kidnapping that Congress contemplated when enacting the Federal Kidnapping Act.

It is also important to note that courts around the country have contemplated appropriate sentences for similarly situated individuals. According to the U.S. Sentencing Commission's Judicial Sentencing Information (JSIN) tool, variances or departures are common. According to JSIN, over the last five fiscal years, there were nine defendants whose primary guideline was § 2A4.1, with a Total Offense Level 34 and a Criminal History Category 1. Notwithstanding the resulting advisory range of 151-188 months, the average sentence imposed on those nine defendants was 108 months, and the median sentence imposed was 85 months.[2] The data makes clear that courts found significant below-guidelines sentences were appropriate in those cases. Given the unique nature of this case coupled with a probation sentence imposed on Ms. Sullivan, Mr. Lozier believes that a significant downward variance would avoid an unwarranted disparity between him and Ms. Sullivan.

---

[2] https://jsin.ussc.gov/analytics/saw.dll?Dashboard

8

**Remaining Factors**

Finally, the requested sentence would satisfy the remaining factors. Given that the time that Mr. Lozier has served incarcerated is the longest period of incarceration that Mr. Lozier has ever served, the requested sentence would promote respect for the law. It should be noted that as a bail bondsman and fugitive recovery agent, Mr. Lozier frequently worked with law enforcement, making him law enforcement-adjacent, a status that has been known throughout his facility since he was first arrested. This period of incarceration has led to anxiety and other medical problems that this Court is aware of. Added to that is the pain of being several hours away from his family and having to know that his son has yet to meet his father. These factors, in addition to the actual time served, have reflected the serious—albeit unique—nature of the offense and provided just punishment. Furthermore, this experience has and will protect the community from any further crimes by Mr. Lozier, and it has served as a significant deterrent for Mr. Lozier. Given that Mr. Lozier is unlikely to ever be licensed as a bail bondsman again with a felony conviction, his ongoing danger to the community is virtually nonexistent.

## CONCLUSION

For the foregoing reasons, Mr. Lozier respectfully requests that this Court impose a sentence of twenty-four (24) months incarceration, followed by a term of supervised release deemed necessary by this Court.

                Respectfully submitted,

                /s/ *Tyler Keith Morgan*
                TYLER KEITH MORGAN
                Assistant Federal Public Defender
                1010 Market Street, Suite 200
                St. Louis, Missouri 63101
                Telephone: (314) 241-1255
                Fax: (314) 421-3177
                E-mail: Tyler_Morgan@fd.org
                ATTORNEY FOR DEFENDANT

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2024, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Matthew Martin, Assistant United States Attorney.

                /s/*Tyler Keith Morgan*
                TYLER KEITH MORGAN
                Assistant Federal Public Defender